IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**BRIAN KEITH LARUE**,                )
                                      )
                    Plaintiff,        )
                                      )
            v.                        )            2:19cv932
                                      )            **Electronic Filing**
**GREAT ARROW BUILDERS LLC**,         )
                                      )
                    Defendant.        )

## <u>OPINION</u>

Seeking to proceed on behalf of himself and all others similarly situated, Brian Keith LaRue ("plaintiff") commenced this "class action" in the Court of Common Pleas of Beaver County, Pennsylvania, against Great Arrow Builders, LLC, based on its asserted failure to pay overtime wages as required by the Pennsylvania Minimum Wage Act, 43 P. S. § 333.101 *et seq.* ("PMWA"). Defendant removed the action on the basis that Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 *et seq.* ("LMRA"), preempts plaintiff's PMWA claim. Defendant filed a motion to dismiss and plaintiff filed a motion to remand. On March 31, 2020, an Order was entered denying defendant's motion to dismiss and granting plaintiff's motion to remand. This opinion is issued in support of that order.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." <u>Rocks v. City of Philadelphia</u>, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is

proper only where the averments of the complaint plausibly fail to raise directly or inferentially

the material elements necessary to obtain relief under a viable legal theory of recovery.  Id. at

544.  In other words, the allegations of the complaint must be grounded in enough of a factual

basis to move the claim from the realm of mere possibility to one that shows entitlement by

presenting "a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Id.  In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of

the elements of a cause of action will not do,'" nor will advancing only factual allegations that

are "'merely consistent with' a defendant's liability."  Id.  Similarly, tendering only "naked

assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient

factual content to permit an inference that what has been presented is more than a mere

possibility of misconduct.  Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8 (A complaint

states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the

[discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura

Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug

Stores, 421 U.S. 723, 741 (1975)); accord Morse v. Lower Merion School Dist., 132 F.3d 902,

906 (3d Cir. 1997) (a court need not credit "bald assertions" or "legal conclusions" in assessing a

motion to dismiss) (citing with approval Charles Alan Wright & Arthur R. Miller, Federal

Practice and Procedure § 1357 (2d ed. 1997) ("courts, when examining 12(b)(6) motions, have

rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted

deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations.'").

     This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("'The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Phillips, 515 F.3d at 235; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("'The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 235) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

     The facts read in the light most favorable to plaintiff are as follows. Defendant is a construction services company that is building a petrochemical facility in Monaca, Pennsylvania for Shell Polymers (the "Project"). Complaint at ¶¶ 5,6. Construction work on the Project is performed by over 3000 hourly trade and craft employees, like plaintiff, who are governed by various collective bargaining agreements ("CBAs"). Complaint at ¶¶ 6, 9.

     Plaintiff worked on the Project on at least a full-time basis from approximately April of 2017 until November of 2018, when he suffered a work-related injury. Complaint at ¶¶ 7, 8. Under the CBAs, defendant, "as a matter of policy," pays plaintiff and other hourly employees

based on the amount of time that transpires between a scheduled start time and a scheduled end time, with a 30-minute meal break deduction.  Complaint at ¶ 9.

Under the CBAs plaintiff and the other hourly employees are required to be at their initial job assignment within the facility at their scheduled start time.  Id.  But defendant's compensation policy assertedly

> results in Plaintiff and other Hourly Employees receiving no payroll credit for mandatory, work-related activities that arise before the scheduled start time and generally take 45-60 minutes to complete.  Such activities include, *inter alia*, waiting at an assigned parking lot for a shuttle bus, riding a shuttle bus from the parking lot to an assigned "muster station," obtaining and donning personal protective equipment at the muster station, and walking from the muster station to the initial job assignment.

Complaint at ¶ 10.

Similarly, defendant's compensation policy assertedly does not compensate hourly employees for mandatory, work-related activities that occur after their scheduled end time.  Complaint at ¶ 11.  These activities generally take 15 minutes to complete and include "waiting for and riding the shuttle bus to the assigned parking lot."  Id.   And depending on the distance between the last job assignment and the assigned muster station, they can also include "walking from the last job assignment to the assigned muster station and doffing and storing personal protective equipment at the muster station."  Id.

Plaintiff maintains that he and the other hourly employees are entitled to receive "'not less than one and one-half times' the employee's regular rate of pay for all hours worked over 40 in a workweek" under the PMWA.  Complaint at ¶ 22 (citing 43 P.S. § 333.104(c)).  And defendant's policy violated this mandate "by failing to pay Plaintiff and the class any compensation for work performed before their scheduled start time and after their scheduled end time during weeks in which their paid hours equaled or exceeded 40."  Id. at ¶ 23 (citing 34 Pa. Code § 231.1(b) (defining "Hours worked" under PMWA).

Against this backdrop, defendant makes two arguments in support of dismissal.  First, plaintiff's "claim rests directly on the rights created by a collective bargaining agreement" or is substantially dependent upon an analysis of the same and therefore will require an "interpretation of the CBAs," which bars the claim pursuant to the complete preemption doctrine crafted under Section 301 of the LMRA.  Second, and relatedly, plaintiff assertedly failed to exhaust the exclusive grievance and arbitration procedures in the CBAs governing such claims and the failure to do so warrants dismissal for failure to exhaust under the controlling precedent.

Plaintiff's response is two-fold.  First, resolution of the PMWA claim presented neither requires an interpretation of any CBA provision nor is inextricably intertwined with such a provision, so the LMRA does not preempt it.  Second, and relatedly, each of the identified activities are forms of compensable work under the PMWA and plaintiff only advances his statutory rights thereunder in support of a recovery.  As a result, the complete preemption doctrine does not apply and there is nothing to arbitrate under the CBAs.  Plaintiff thus maintains that federal jurisdiction is lacking and his motion to remand should be granted.

The complete preemption doctrine does not bar plaintiff's PMWA claim.  Defendant's challenge to plaintiff's claim is rooted in Section 301 of the LMRA.  It provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Supreme Court has construed this provision to authorize the federal courts to fashion a body of common law for the enforcement of collective bargaining agreements.  Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456 (1957).  A central goal in doing so is to create a coherent body of federal law that provides a "uniform interpretation of

5

contract terms to aid [in] both the negotiation and the administration of collective bargaining agreements." Antol v. Esposto, 100 F.3d 1111, 1115 (1996) (citing Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04 (1962) (differing interpretations would stimulate and prolong labor disputes)); accord Lingle v. Norge, Div. Of Magic Chef, Inc., 486 U.S. 399, 410–11 (1988) (federal labor policy fosters uniform, certain adjudications of disputes over the meaning of collective bargaining agreements).

The need for uniformity and predictability has given rise to the doctrine of complete preemption, which the Supreme Court first recognized in Lucas Flour Co.. There, the Court explained that the "dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute [so that] issues raised in suits of a kind covered by § 301 [are] decided according to the precepts of federal labor policy." 369 U.S. at 103. The Court thus opined that "in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." Id. at 104.

In order to serve these important federal interests, "the Court in Lucas Flour held that a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210 (1985). Consistent with this principle, "[a] state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law." Id.

Recognizing pre-emption in this setting serves the important federal interest of preserving the effectiveness of arbitration in the context of labor/management relations. Id. at 219 ("The need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in Lucas Flour.") (citing Lucas Flour, 369 U.S. at 105). A contrary rule would permit unionized employees to sidestep the collectively-bargained procedures which in turn

would undermine the effectiveness of arbitration and "eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance."  Id. at 220.

Section 301 preemption applies not only to state-law contract claims seeking to enforce the terms of a CBA, but also extends to state-law tort claims that are derived from the duties and/or obligations imposed by a CBA.  Id. at 213 ("Therefore, state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are pre-empted by those agreements.").  The focus in identifying such claims is whether the state law "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the [state law] claim is inextricably intertwined with consideration of the terms of the labor contract."  Id.  If the state law claim "purports to define the meaning of the contract relationship, [it] is pre-empted."  Id.

In contrast, state law claims that arise in the context of labor relations are not preempted if resolution of the state-law claim does not require an "interpretation" of the collective bargaining agreement.  Lingle, 486 U.S. at 410-11 ("In sum, we hold that an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement"); Antol, 100 F.3d at 1117 ("Claims that are independent of a collective bargaining agreement, even if they are between employees and employers, are not [pre-empted and thus not] removable.").  And a claim in such a setting is not preempted "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the

same set of facts, so long as the state-law claim can be resolved without interpreting the agreement itself." Lingle, 486 U.S. at 409-410.

While Section 301 preemption is paramount to protecting the federal interests and policies that underlie the doctrine, it is not to be given broad application "to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." Livadas v. Bradshaw, 512 U.S. 107, 123 (1994). In drawing the lines of demarcation in this arena, it is "the legal character of a claim" that determines "whether a state cause of action may go forward." Id. at 123-24. To do so, the claim must be one that truly is "independent" of rights created through the collective bargaining agreement. Id. And where "the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Id. at 124 (citing Lingle, 486 U.S. at 413, n. 12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled."). For example, a state law entitling workers to compensation for all unpaid wages directly following termination is not preempted by Section 301 notwithstanding the existence of an arbitration clause in a CBA, even though the applicable rate of pay is set by that agreement. Livadas, 512 U.S. at 125 ("Lingle [made] plain in so many words that when liability is governed by independent state law, the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301.").

The jurisprudence forming the complete preemption doctrine under Section 301 has not developed in a linear fashion and the doctrine has been the source of much litigation. See, e.g., Voilas v. General Motors Corp., 170 F.3d 367, 373 (3d Cir. 1999) (summarizing the

development of Section 301 preemption, which "evolved in a series of Supreme Court cases decided from 1985 to 1994" and explaining that the doctrine has been clarified and applied in an increasingly limited manner); Antol, 100 F.3d at 1115 (The progression of Section 301 preemption case law "has not been completely consistent, particularly when state law may affect the outcome.").  And ascertaining whether any particular state law claim is substantially dependent upon the rights or obligations created by a CBA or is inextricably intertwined with the same is often a difficult undertaking.  Cf. Oddo v. Bimbo Backeries USA, Inc., 2017 WL 2172440, *5 (D. N.J., May 17, 2017) ("Whether a claim requires a court to construe or interpret a CBA to the point that the claim depends on interpretation of the CBA is a question riddled with nuance and exception.").

The United States Court of Appeals for the Third Circuit provided clarification of the requisite undertaking in Bell v. Southeastern Pennsylvania Transp. Authority, 733 F.3d 490 (3d Cir. 2013).  There, a § 216 collective action under the Fair Labor Standards Act was commenced by bus and trolley operators employed by the Southeastern Pennsylvania Transportation Authority ("SEPTA").  They sought to recover unpaid wages and overtime compensation for pre-trip tasks that were required before the start of their daily run.  Id. at 491.  These tasks consisted of "reporting tasks," such as "checking in with the dispatcher, collecting and punching passenger transfers, filling out forms and waybills, reading SEPTA 'Bulletin Orders,' checking daily detours and operating conditions, copying their run schedules, and determining and walking to the location of their vehicles."  These tasks took about ten minutes to complete.  Although the operators were compensated for the ten minutes, the time was not included in the calculation of overtime.  Id. at 492.

The operators also were required to perform daily pre-trip inspections, which were known as the "CDL Inspections."  They were required to inspect several items on each vehicle, including the braking system, lights, horns, doors, turn signals, wheelchair lifts, and the PA system.  These inspections took about fifteen minutes to complete.  The operators alleged they were not compensated for these inspections, and they were required to perform them "off the clock."  Id.  They further averred that because they worked 40 hours a week exclusive of the time spent performing the CDL inspections, "SEPTA's failure to compensate them for this time result[ed] in unpaid overtime wages, constituting a willful violation of the FLSA."  Id.

The parties were bound by three collective bargaining agreements that contained broad grievance and arbitration provisions.  These CBAs each contained a section that allotted a set amount of time for reporting in advance of the employee's scheduled start time.  Although each of these provisions allotted this set period of compensable time, they excluded the time from overtime calculations.  Id.

The District Court granted SEPTA's motion to dismiss "on the ground that the FLSA claim required the interpretation of the provisions [in the CBAs]  between SEPTA and the unions representing the Operators and [the Operators' claim to overtime was] therefore subject to those agreements' grievance and arbitration provisions."  Id. at 491.  In doing so, the District Court relied on Vadino v. A. Valey Engineers, 903 F.2d 253 (3d Cir. 1990).  In Vadino, an employee brought two claims against his former employer: (1) a claim alleging his employer breached the CBA by paying him apprentice wages and not the higher rate due to a "journeyman," even though he was certified by his union as a journeyman; and (2) a claim under the FLSA because his overtime rate should have been one and one-half times the journeyman rate.  Id. at 257.  Vadino admitted that he was paid for overtime at one and one-half times his "normal" hourly

rate, *i.e.*, his apprentice hourly rate; he just was not paid at one and one-half times the hourly rate for a journeyman.  Id. at 264.  The Third Circuit held that Vadino's FLSA claim was tethered to the threshold question of whether he was entitled to journeyman wages or the normal wages under the governing CBA.  And as a result, his FLSA claim was entirely derivative of his breach of contract claim.  Because the claim was dependent on an interpretation of the CBA, Vadino could not proceed with his FLSA claim without first arbitrating whether he had been paid the appropriate hourly rate under the framework of the CBA.  Only upon successfully prevailing in the arbitration could he then pursue his FLSA rights in federal court.  Id. at 494.

The Bell court vacated the District Court's order and held that the SEPTA operators' claim was independent of the applicable CBAs.  Bell, 733 F.3d at 495-97.  In doing so it distinguished Vadino as a situation where the employee's FLSA claim was "inevitably intertwined" with the application of the CBA to Vadino's proper classification (and rate of pay) and thus his FLSA claim was entirely derivative of his breach of contract claim.  Id. at 493-94.  In sharp contrast, the court concluded in Bell that the operators' claim was one founded on separate, individual rights and it was neither dependent upon the applicable of the CBAs nor would it be affected by submitting the parties' dispute to arbitration.  Id. at 493-94, 496.

In rendering its decision, the Bell court drew on the teachings of Barrentine v. Arkansas–Best Freight System, Inc., 450 U.S. 728 (1981).  In Barrentine, the Supreme Court addressed the distinction between claims "arising out of breaches of collective bargaining agreements (in that case, under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185), and those brought under the FLSA."  Bell, 733 F.3d at 493.  The Supreme Court explained that the LMRA governs relationships between employers and unions by "encouraging the negotiation of terms and conditions of employment through the collective-bargaining process," while the FLSA is "a

different genre of statute, one which 'guarantees covered employees specific substantive rights.'" Bell, 733 F.3d at 493 (quoting Barrentine, 450 U.S. at 734).  The minimum protections afforded by the FLSA to individual workers, including the mandate for overtime pay, "take precedence over conflicting provisions in a collectively bargained compensation arrangement."  Bell, 733 F.3d at 493 (quoting Barrentine, 450 U.S. at 740–41).  "An employee's right to relief under the FLSA, therefore, is distinct from an employee's contractual rights as provided in a collective bargaining agreement."  Id. at 494 (citing  Barrentine, 450 U.S. at 740) ("[T]he FLSA rights petitioners seek to assert in this action are independent of the collective-bargaining process. They devolve on petitioners as individual workers, not as members of a collective organization.").  And the FLSA's enforcement scheme grants an employee broad access to the courts without requiring exhaustion or other procedural barriers or mandating the use of any particular forum.  Id.

        In light of these important differences, an employee must first resort to the procedures contemplated under the LMRA only where a FLSA claim is inevitably intertwined with the interpretation or application of a CBA.  Such was the case in Vadino.  Id. at 494.  In distinguishing the operators claims in Bell, our Circuit opined:

> Unlike the employee in Vadino, the Operators do not contend that they are entitled to additional payment under a CBA.  Neither do they contend that SEPTA fails to compensate them in the amounts set forth in the CBAs for time spent performing their duties prior to the scheduled starting time.  Indeed, the Operators do not allege that SEPTA has violated the terms of the CBAs in any way.  Rather, they argue, their FLSA claim exists independently of any rights they have under their respective CBAs: (1) they are not fully compensated for approximately fifteen minutes spent performing CDL inspections; and (2) their pre-trip responsibilities, the CDL inspections and the Reporting Tasks, are not included in the calculation of overtime.  Neither of these alleged failures necessitates the resolution, as the District Court concluded, of the "applicability of the contractual provisions [regarding pre-trip reporting in the CBAs] to morning inspections."  Nor is the FLSA claim at "issue in this case [ ] compensation for morning pre-trip inspections pursuant to the terms of the CBAs."  Rather, resolution of the FLSA claim requires a factual determination of the amount of time Operators are required to work prior to their

scheduled start, and a legal determination regarding whether this time is (1) compensable and (2) subject to the overtime provisions of the FLSA.  29 U.S.C. § 207(a)(1).  Unlike Vadino, neither of these determinations depends on the resolution of a disputed reading of the CBAs.

Bell, 733 F.3d at 495.  Thus, the nature of the legal claim presented and what the operators had

to prove were not dependent upon any aspect of the CBAs, notwithstanding that the challenged

practices by SEPTA were addressed in each of them.

The Bell court also observed that the parties' dispute could not meaningfully be altered by

submitting the claims to arbitration.  It further opined:

> Were the parties to arbitrate a dispute over the CBA provisions governing time spent working prior to the morning scheduled start time—to the extent there even exists a dispute—there would be no effect on the Operators' FLSA claim.  If, for instance, an arbitrator were to determine that the pre-trip vehicle inspections are "covered" by the CBA provisions, the Operators would still have a claim that their payments under the CBA violate the FLSA.  Accepting the facts alleged in the Complaint as true, as we must, the Operators are being compensated, pursuant to the CBAs, for only 12 or 15 minutes of 25 minutes of compensable work, none of which is calculated when assessing overtime.  If pre-trip vehicle inspections are not "covered" by the CBA provisions, there is simply no provision governing compensation for those inspections.  The result is the same, and the Operators are entitled to the same statutory relief.

Bell, 733 F.3d at 496.  Thus, in sharp contrast to Vadino where the existence of an FLSA was

"consequential" to the wage dispute under the CBA, the operators were advancing a claim based

solely on their independent statutory rather than contractual rights and ample precedent

supported the view that the operators were entitled to pursue their claim unabated by Section

301.  Id.[1]

---

[1]  The court cited the following cases in support:

Barnello v. AGC Chems. Ams., Inc., Civ. No. 2:08–CV03505, 2009 WL 234142, at *3 (D.N.J. Jan. 29, 2009) (distinguishing Vadino and denying motion to dismiss where plaintiffs "do not claim that they are owed compensation pursuant to the CBA and further emphasize that their claims stem solely from their alleged statutory right to compensation for time worked under the FLSA" (internal quotation marks omitted)); Gordon v. Kaleida Health, 08–CV–378S, 2008 WL 5114217, at *9 (W.D.N.Y. Nov. 25, 2008) (distinguishing

The United States Court of Appeals for the Third Circuit followed the framework established in Bell in Jones v. Does, et al., 857 F.3d 508 (3d Cir. 2017).  There, certified nursing assistants brought a collective action under the FLSA and related New Jersey wage and hour laws against their employer, SCO Silver Care Operations ("Silver Care").  The plaintiffs claimed they were underpaid for overtime in two distinct ways.  First, their overtime rate of pay did not include certain hourly wage differentials in their regular wages that reflected shift premiums and raises, resulting in artificially low overtime rates.  Second, Silver Care deducted half-hour meal breaks from the total hours worked as a matter of course, even though the plaintiffs often were forced to work through those breaks due to workload and staff shortages.  Prior to discovery Silver Care moved to dismiss or stay the proceeding in order to submit the claim to arbitration under the governing CBA.  The District Court denied the motion and Silver Care appealed, "contending that both overtime claims must first be submitted to arbitration to resolve disputed interpretation of the CBA, including the definition of the wage differentials and policies concerning the meal breaks."  Id. at 510.

---

Vadino where plaintiff withdrew challenge to the CBA and claim for unpaid wages was only "statutorily based" on the FLSA); Gallagher v. Lackawanna Cnty., Civ. No. 07–0912, 2008 WL 9375549, at *6 (M.D. Pa. May 30, 2008) (concluding that plaintiffs' claims "aris[ing] under and concern[ing] the meaning of a federal statute, and specifically the meaning of 'compensable work' under the FLSA" need not be arbitrated); Andrako v. U.S. Steel Corp., Civ. No. 07–1629, 2008 WL 2020176, at *5 (W.D. Pa. May 8, 2008) ("[The plaintiffs'] argument is that [the disputed] time is compensable work under the FLSA irrespective of what the CBA provides.... Because ... the FLSA claim is not dependent on the interpretation of a disputed provision of the CBA, it would be improper ... to dismiss the FLSA claim on that basis...."); Moeck v. Gray Supply Corp., Civ. No. 03–1950, 2006 WL 42368, at *3 (D.N.J. Jan. 6, 2006) (denying motion to dismiss where "[p]laintiffs' claims are not based on an interpretation of the collective bargaining agreement with respect to the appropriate wage rate, but are based on their contention that they are entitled to overtime" under the FLSA).

Bell, 733 F.3d at 496-97.

14

The Jones Court framed the issue on appeal as "the applicability of the arbitration clause in the CBA to each of the plaintiffs' FLSA overtime claims."  Id. at 512.  The court employed the following principles of law to guide its inquiry: arbitration of a federal statutory claim may be compelled "when (1) the arbitration provision clearly and unmistakably waives the employee's ability to vindicate his or her federal statutory right in court; and (2) the federal statute does not exclude arbitration as an appropriate forum."  Id. (citing 14 Penn Plaza v. Pyett, 556 U.S. 247, 260 (2009)).  And in the absence of such a waiver, arbitration of such a claim may nevertheless be compelled where the claim "depends" on a disputed interpretation of a CBA provision.  Id.; accord Bell, 733 F.3d at 494; Vadino, 903 F.2d at 266.  It was undisputed that the CBA did not contain a clear and unmistakable waiver of the nurses' ability to invoke the protections of the FLSA.  Thus, the issue presented was whether their FLSA claims depended on disputed interpretations of the CBA.  Id. at 513.

The majority in Jones held that the two components of the nurses' overtime claim did not depend on any disputed term of the CBA.  Silver Care argued that the differentials component actually reflected an implicit term of the CBA – that an understanding was reached in negotiating the CBA that the differentials consisted of a base amount and an additional amount for overtime; for example, the $3.00 weekend differential reflected $2.00 per hour regular time and a $1.00 an hour for overtime.  Id. at 513.  It further argued that the meal breaks component was arbitrable based on whether the employer or employee enjoyed the benefit of all or a portion of the break and the shop practices that had developed around meal breaks.  From Silver Care's perspective these practices, such as the length of the meal break, the type of interruption, how the interruption was handled, and whether there was additional renumeration based on any particular

form of interruption, could, through arbitration, affect the outcome of this portion of the nurses' FLSA claim.  Id. at 515-16.

The Jones court held that each component of the nurses' claim was controlled by the framework established in Bell.  First, the miscalculation component required a determination of the nurses' "regular rate" of pay, which involved a factual determination of the nurses' regular rate of pay under the FLSA regulations governing that term and then a legal determination of whether the nurses had received proper renumeration for all hours worked in excess of 40 in accordance with that rate.  Because these matters were grounded in determinations of fact and the application of the FLSA regulations, the treatment of the rates of pay in the CBA and thus the compelling of arbitration could not affect the outcome of this component.  Id. at 514 (citing Smiley v. E.I. Dupont De Nemours & Co., 839 F.3d 325, 330 (3d Cir. 2016) and Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)).

Silver Care's contentions pertaining to the effect of the shop practices on the nurses' mealtime component suffered from similar shortcomings.  Recognizing that the mealtime component was predicated on the FLSA and how compensable work is defined under the statute, Silver Care posited that arbitration was necessary to determine to which parties' benefit the break inured.  Id. at 515.  But all of the identified and "disputed" interpretations of the CBA were in actuality "factual questions - length of meal breaks, types of interruptions, how they were handled, and whether the plaintiffs ever received compensation due to these interruptions."  Id. at 516.  And statutorily based factual disputes, which are inherent in a FLSA dispute, do not in themselves transform the inquiry into one that involves the text and interpretation of a CBA.  Id. at 516-17.

16

Because the nurses' FLSA claims 1) presented factual questions that were framed by the statute and its regulations and a legal determination as to whether the challenged practices as carried out had resulted in the underpayment of overtime compensation, and 2) did not improperly devolve into disputes involving the interpretation of the text and meaning of the CBA, or dependent on such a dispute, the FLSA claims were not subject to arbitration under the CBA.  Accordingly, the ruling of the District Court was affirmed.  Id.

The district courts likewise have utilized the framework of Bell in evaluating whether state wage and hour claims are preempted by the LRMA and/or subject to dismissal for failure arbitrate under a collective bargaining agreement.  In Phil. Metal Trades Council v. Konnerud Consulting West, A.S., and R+S Stolze GMBH, 2016 WL 1086709 (E.D. Pa. March 21, 2016), an unincorporated association of local unions brought an action under the PMWA and the Pennsylvania Wage Payment and Collection Law on behalf of the members of two unions who had worked for the defendants on an hourly basis at a Philadelphia shipyard.  The gravamen of the claims was that the hourly workers had worked over forty hours a week and the defendants failed to pay them overtime wages in violation of the PMWA.  Id. at *3.  The action was filed in state court, removed and a motion to dismiss was filed.  Id.  Among other challenges, defendant Konnerud argued that the plaintiff's claims were barred because 1) the employees had failed to arbitrate the claims pursuant to the governing CBAs and 2) such state-law claims were preempted by the FLSA.  Id. at *5.

In denying the motion, Judge Tucker followed the growing body of authority recognizing that where a plaintiff pursues a claim for overtime based solely on statutory rights and the claim does not depend on an interpretation of a collective bargaining agreement, the "courts have permitted plaintiffs to proceed with their statutory claims without first exhausting their CBA's

17

arbitration procedures." Id. at *11-12 (citing Bell, 733 F.3d at 496; Rolon v. Lackawanna Cnty.,

1 F. Supp. 3d 300, 305 (M.D. Pa. 2014) (denying motion to dismiss because plaintiff's overtime

claim under the FLSA did not depend on a disputed CBA provision); and Moeck v. Gray Supply

Corp., No. 03–1950, 2006 WL 42368, at *3 (D. N.J. Jan. 6, 2006) (denying motion to dismiss

where "[p]laintiffs' claims are not based on an interpretation of the collective bargaining

agreement with respect to the appropriate wage rate, but are based on their contention that they

are entitled to overtime" under the FLSA).  After highlighting the framework in Bell, Judge

Tucker held that "the resolution of [the] Plaintiff's claims requires a factual determination of the

amount of overtime the Employees worked and a legal determination whether such time is

compensable under the PMWA."  And because the PMWA claim was based solely on statutory

rights and did not depend on an interpretation of the applicable collective bargaining agreement,

the plaintiff did not have to pursue arbitration prior to proceeding with the wage and hour law

claim.  Id. at 13.[2]

       Judge McNulty was presented with a similar situation in Oddo v. Bimbo Bakeries USA.

There, a group of sales representatives who alleged their primary duties involved driving

delivery trucks along established routes and stocking products at chain and local retailers

commenced an action for unpaid overtime wages pursuant to the FLSA and the New Jersey

Wage and Hour Law ("NJWHL").  2017 WL 2172440 at *1.  These "route sales representatives"

---

[2] The court likewise denied the motion to dismiss to the extent it was based on the contention that the PMWA claim was preempted by the FLSA.  Id. at *19-20.  In addition to rejecting the proposition that a class action seeking to enforce rights under the PMWA was a proceeding that Congress sought to eliminate by mandating the opt-in approach of the FLSA, the court reasoned that "[l]ike the minimum wage laws in Maryland and Ohio, the PMWA substantially parallels the standards and definitions of the FLSA."  And just as the Third Circuit had recognized that the FLSA did not preempt those state wage and hour law statutory schemes, the FLSA did not impliedly preempt the PMWA.  Id. at *20

("RSRs") alleged they received a base pay plus commissions on sales, but did not receive overtime pay.  They further alleged that the defendant had failed to implement a contractually required tracking system to capture accurately the hours they worked.  Id.

The defendant moved to dismiss both claims on the ground that the employment relationship was governed by a series of collective bargaining agreements and eight terms in those agreements governed the plaintiff's rate of pay.  Id. at *2.  These included various allocations for vacations, holidays and similar leave and service time wages and a basic wage and overtime pay formula and scale.  Id.  An alternative compensation program incorporated the wage and overtime pay formula as a substitute to the commission-based pay formula where the pay formula produced a higher rate of pay for a given week.  Id.   The preface to this alternative compensation formula provided: "[t]he Company and the Union agree that the base pay and commission provisions of the parties' [CBA] compensate fully [RSRs] under federal and state overtime pay laws because of their job duties as outside salespersons and because the U.S. Secretary of Transportation has the power to regulate the [RSRs] in the performance of their duties."  Id.  The defendant further maintained that in light of preemption under Section 301 of the LRMA, the plaintiffs could only proceed pursuant to the CBA's mandated grievance and arbitration provisions, which in turn warranted dismissal for failure to exhaust.

Judge McNulty denied the motion to dismiss based on the independent nature of the plaintiffs' claims.  In doing so he reasoned that drawing connections between pay provisions in the CBA and the applicable regulations under New Jersey law did not require "*interpretation* of the CBA."  Id. at *8 (emphasis in original).  In this regard, the parties had failed to present an actual "live interpretational dispute as to specific terms in the CBA that [] would need [to] be resolved in order to adjudicate the RSR's NJWHL claims."  Id. (citing Livadas, 512 U.S. at 1240

and finding this to be "an important factor" in light of Bell's framework).  Further, the plaintiff's

"regular hourly wage" under the formula in the NJWHL was a factual inquiry that could be

ascertained through the benefit of discovery.  And given the independent nature of the duties

imposed by the NJWHL, the mere potential for an overlap with a hypothetical LRMA claim did

not make the claim substantially dependent or otherwise mandate preemption.  Id. at *9 (quoting

in support Polanco v. Brookdale Hosp. Med. Ctr., 819 F. Supp.2d 129, 133 (E.D. N.Y. 2011)

("[e]ven if resolution of a state-law claim 'involves attention to the same factual considerations as

the contractual determination . . . such parallelism [does not mandate preemption].'") (quoting

Lingle, 486 U.S. at 408).

Given the backdrop set forth above, it is clear that Bell's framework supports the same

result in this case.  Plaintiff does not seek to vindicate or recover on any right established in the

governing CBAs.  To the contrary, he admits that the identified time for pre- and post-shift travel

and donning and doffing are excluded from the scope of compensation under the terms of the

CBAs.  See, e.g., Plaintiff's Brief in Opposition to Motion to Dismiss (Doc. No. 20) at p. 11

("The CBA is not ambiguous regarding Plaintiff's PMWA claim that time spent waiting for and

riding the shuttle bus at the beginning and end of the workday is compensable work under the

PMWA.  In fact, Defendant's motion papers direct the Court to contract provisions that

unambiguously demonstrate that Plaintiff is not paid for such time.  See ECF No. 9 at ¶¶ 7-8;

ECF No. 9-1 at pg. 68 of 81, ¶ 3(d).  Plaintiff here (just like the plaintiffs in Glatts [v. Keystone

Health System, 645 F. Supp.2d 446 (E.D. Pa. 2009)] and Lambert [v. Highlands Hospital, 2012

U.S. Dist. LEXIS 144541 (W.D. Pa. Oct. 5, 2012)] supra) agrees that the time he spent waiting

for and riding the shuttle bus is not compensable under the CBA.").  The only claim plaintiff

seeks to advance is whether the uncompensated time spent engaged in pre-shift transit and

20

donning and a portion of post-shift transit and, under certain circumstances, post-shift walking, doffing and storing equipment, constitute compensable time under the PMWA.

The rights afforded to employees under the PMWA are independent of any contract right arising under the CBA.  The PMWA initially was enacted 30 years after the FLSA became law and was thereafter expanded in 1988.  Chevalier v. General Nutrition Centers, Inc., 220 A.3d 1038, 1055 (Pa. 2019).  Its legislative history makes clear that it was designed to create a strong public policy in the Commonwealth in favor of protecting and expanding employee wages.  Id. And it expressly provides an individual employee with the right to a private cause of action to enforce the Act.  43 P. S. § 333.113.

The PMWA in large measure tracks the protections in the FLSA and seeks to effectuate the same general public policy.  Phila. Metal trades Council,  2016 WL 1086709 at *4  (citing Ford-Green v. NHS, Inc., 106 F. Supp.3d 590, 613 (E.D. Pa. 2015) (highlighting the substantial similarity between the mandates and overall objectives of the PMWA and FLSA and noting the consistent treatment given to the statutes when claims are brought under both statutory schemes). Precedent under one should be treated as applicable to the other unless there is sound textual support for a contrary result.  Id. at *5 (following the established pleading requirements for a FLSA claim in evaluating a challenge to a PMWA claim).

Notwithstanding this general parallelism, the FLSA and the PMWA are best viewed as being at times in a hierarchical relationship.  The purpose of the FLSA was to establish a floor for the protections to be afforded workers within its scope.  Verderame v. RadioShack Corp., 31 F. Supp.3d 702, 709 (E.D. Pa. 2014) ("The FLSA was meant to establish a national floor under which wage protections cannot drop, not to establish absolute uniformity in minimum wage and overtime standards nationwide at levels established in the FLSA.") (citing  Pac. Merch. Shipping

Ass'n v. Aubry, 918 F.2d 1409, 1425 (9th Cir. 1990) (emphasis in original); In re Cargill Meat Solutions Wage and Hour Litigation, 632 F. Supp.2d 368, 393 (M.D. Pa. 2008) (same).  In effectuating this policy, it was the intent of Congress "to leave undisturbed 'the traditional exercise of the states' police powers with respect to wages and hours more generous than the federal standards.'"  In re Cargill, 632 F. Supp.2d at 393; accord Lehman v. Legg Mason, Inc., 532 F. Supp.2d 726, 731 (M.D. Pa. 2007) (Rambo, J.) (In enacting the FLSA, "Congress acted only with respect to federal claims, however, and did not preempt or limit the remedies available through state law.") (citing McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304, 308 (D. Mass. 2004)).  And in this regard the states, and particularly the Commonwealth of Pennsylvania, have established protections in the area of wage and hour laws that provide supplemental protections above those afforded by the FLSA.  Bayada Nurses, Inc., 8 A.3d 866, 883 (Pa. 2010) (upholding more favorable protections for domestic services workers under the PMWA and opining that "the FLSA does not supersede state law; Pennsylvania may enact and impose more generous overtime provisions than those contained under the FLSA which are more beneficial to employees; and it is not mandated that state regulation be read identically to, or in *pari materia* with, the federal regulatory scheme.  Thus, we reject Bayada's assertion that federal law compels a different result than that reached by the Commonwealth Court."); Chevalier v. General Nutrition Centers, Inc., 220 A.3d 1038, 1058 (Pa. 2019) ("Considering this application in light of the unmistakable intent of the General Assembly to use the Commonwealth's police power to increase wages to combat the 'evils of unreasonable and unfair wages,' 43 P.S. § 333.101, we

conclude that the rules of statutory construction favor Plaintiffs' interpretation requiring application of the 1.5 Multiplier.").[3]

One of the areas where the PMWA can provide supplemental protections is that of donning and doffing.  In re Cargill, 632 F. Supp.2d at 394.  In passing the PMWA, the Pennsylvania legislature did not include a counterpart to § 203(o) of the FLSA or other similar provisions.  Id.  "[A]s a result Pennsylvania law protects employees by not permitting unions and employers to negotiate away payment for donning and doffing of clothes as Congress has under the FLSA."  Id.; cf. Lugo v. Farmer's Pride, Inc., 967 A.2d 963, 968 (Pa. Super. Ct. 2009) ("According to the complaint then, appellee required appellants to be on its premises and on duty during the donning, doffing, and sanitizing of the protective gear.  If the averments of the complaint are proven true, then clearly the PMWA would consider the time spent donning, doffing, and sanitizing the protective gear as part of the 'hours worked' and for which appellants would be owed wages under the PMWA.").

Another area where the PMWA has been interpreted as potentially providing supplemental protections is in shuttled transportation to and from the work site, at least where safety discussions and random drug tests were carried out in the interest of the employer during the time in question.  See generally Bonds v. GMS Mine Repair & Maint., 2017 Pa. Dist. & Cnty. Dec. LEXIS 10622 (Wash. Cnty. Ct. of Common Pleas,  Dec. 12, 2017).  Coverage of such

---

[3]  In Bayada Nurses, Inc., the Supreme Court of Pennsylvania upheld the Pennsylvania Department of Labor's promulgation of a regulation governing the domestic services exemption under the PMWA that was more favorable to employees than its counterpart in the FLSA.  8 A.3d at 882-83.  And in Chevalier, the Court adopted a 1.5 multiplier for overtime calculation of salaried employees working fluctuating hours in contrast to the .5 multiplier used under the FLSA.  It did so based in part on the General Assembly's expressed intent to exercise its police powers in enacting the PMWA in favor of protecting and expanding employee wages.  220 A.3d at 1055-56.

activities turns on issues of fact under the PMWA's regulations defining compensable time.  Id. at * 8-9.

It follows that plaintiff's claim in the instant matter is one grounded solely on his rights under the PMWA.  He presents an individual cause of action to pursue asserted rights under the potentially more favorable protections afforded by that Act.  And just like the FLSA, the courts have recognized that the PMWA bestows individual rights and protections that cannot be presumed to have been impliedly waived.  In re Cargill, 632 F. Supp.2d at 394; cf. Barrantine, 450 U.S. at 740 ("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act.  Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate.") (collecting cases).

Moreover, the adjudication of plaintiff's PMWA will only require resolution of factual matters that are independent of any right or claim under the CBAs.  In proving a PMWA claim for unpaid overtime, the courts generally have adopted the standards of pleading and proof under the FLSA.  See Ford-Greene, 106 F. Supp.3d at 612-13; Materson v. Federal Exp. Corp., 2008 WL 5189342, *4 (M.D. Pa. Dec. 10, 2008) (reading the PMWA and the FLSA in pari materia based in part on legislative history of the PMWA and adopting a workweek formula for the application of the PMWA's minimum wage standards).  To plead a claim for failure to pay overtime in violation of the FLSA, a plaintiff generally must allege that (1) the defendant was "engaged in commerce" as that phrase is defined by the FLSA; (2) he was an "employee" as defined by the FLSA; and (3) he worked more than forty hours in a week but was not paid overtime compensation for the hours worked in excess of forty.  See Mell v. GNC Corp., 2010

U.S. Dist. LEXIS 118938 (W.D. Pa. Nov. 9, 2010) (citing Zhong v. August August Corp., 498 F.

Supp. 2d 625, 628 (S.D. N.Y. 2007)).  Stating a claim under the PMWA essentially follows the

same format.  See, e.g., Bansept v. G & M Automotive, -- F. Supp. 3d --, -- 2020 WL 374422, *3

(E.D. Pa. Jan. 22, 2020) ("in order to state a plausible FLSA [or PMWA] overtime claim, a

plaintiff must sufficiently allege [forty] hours of work in a given workweek as well as some

uncompensated time in excess of the [forty] hours.") (quoting Davis v. Abington Mem'l Hosp.,

765 F.3d 236, 242 (3d Cir. 2014) and Lundy v. Catholic Health Sys. of Long Island, Inc., 711

F.3d 106, 114 (2d Cir. 2013) (brackets in original)).

Plaintiff's complaint easily meets these standards.  He has alleged he was a full-time

employee in the Commonwealth who frequently worked over forty hours a week.  He typically

was credited by defendant with working over fifty hours a week.  During these weeks, plaintiff's

time was calculated by defendant utilizing a scheduled start time and end time.   Plaintiff was

required to be at his job assignment within the Project facility at the scheduled start time.  He

would be compensated for the hours worked through the scheduled end time, less one-half hour

for a meal break.  Plaintiff posits as an example: "his scheduled start time on Tuesdays was

typically 7:00 a.m., and his scheduled end time on Tuesdays was typically 5:30 p.m.," resulting

in plaintiff receiving credit for a 10 hour day (10.5 hours minus .5 hours).  Class Action

Complaint (Doc. No. 1-2) at ¶¶ 7-9

Plaintiff claims a right under the PMWA to recover for travel time and donning that

occurred at defendant's direction prior to his scheduled start time: riding a shuttle bus, obtaining

protective gear and walking to his initial job assignment.  He likewise claims a right under the

PMWA to recover for travel time and doffing that occurred after his scheduled end time: riding a

shuttle bus to the assigned parking lot, and, on certain occasions, walking from the last job site,

doffing protective equipment and storing it at the muster station.  Id. at ¶¶ 10-11.
Notwithstanding that these activities are outside the scope of compensation under the CBAs,
plaintiff asserts and seeks to prove they are a form of compensable work under the PMWA.  Id.
at ¶ 23 & n.1.

As in Bell, plaintiff does not claim any right to be compensated for the pre-start or post-
end times under the CBAs.  Id.  In fact, he merely points to the CBAs as evidence of a
compensation policy that explicitly excludes this time from compensable wages.  Plaintiff's Brief
in Opposition (Doc. No. 20) at p. 14 ("Plaintiff does not contest the applicability of these rules or
requirements, all of which confirm that he was not paid for time associated with the relevant
activities.").  He solely claims that he and the other similarly situated hourly workers are entitled
to be compensated for this travel time and donning and occasional doffing activities as a matter
of independent right under the PMWA.  Class Action Complaint (Doc. No. 1-2) at ¶ 23 & n.1.

Determining whether these times were compensable work under the PMWA does not
depend on an application of any term or provision of the CBAs to the time/activity in question.
No aspect of plaintiff's PMWA claim is tethered to or otherwise contingent upon an application
of competing or ambiguous terms of the CBAs.  Similarly, compensation for this travel and
safety preparation time under the PMWA does not arise from or turn on any provision of the
CBAs.  To the contrary, resolution of the PMWA claim requires a factual determination of the
amount of time plaintiff and the similar hourly workers spent prior to/after their scheduled
starting and ending times and a legal determination regarding whether this time is (1)
compensable under the PMWA's definition of "hours worked" and (2) is subject to the overtime
provisions of the PMWA.  None of these determinations depends on the resolution of a disputed
reading of the CBAs.

It likewise is clear that submitting the parties' current dispute to arbitration cannot resolve any aspect of the PMWA claim presented.  It is hornbook law that in resolving disputes under a CBA, an arbitrator must apply the terms of the contract and cannot create or address matters outside the terms of the agreement.  See, e.g., News American Publications, Inc., Daily Racing Form Div. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24-25 (3d Cir. 1990) (the quintessential standard of review of federal arbitration decisions is whether the decision draws its essence from the parties' collective bargaining agreement).  In other words, the arbitrator's rulings must be derived from the existing agreement.  An arbitrator is not empowered to compel the parties to enter into new agreements or create new provisions in existing ones.  See Pennsylvania Power Co. v. Local Union No. 272, Broth. Of Elec. Workers, AFLCIO, 276 F.3d 174, 179 (3d Cir. 2001); see also Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1291 (3d Cir. 1996) ("[W]e must enforce an arbitration award if it is based on an arguable interpretation of the collective bargaining agreement, and we may only vacate an award if it is entirely unsupported by the record or if it reflects a 'manifest disregard' of the agreement.").

Here, it is undisputed by plaintiff that the CBAs do not provide any right to be compensated for the challenged time.  From his perspective the CBAs operate expressly to exclude such time.  In other words, plaintiff does not seek to join any issue concerning the right to recover as a matter of contract law.

It follows that an arbitration award determining that some term or terms in the CBAs implicitly encompass the time and foreclose plaintiff's rights under the PMWA would run afoul of the central tenant in Section 301 arbitration that an "arbitrator may not ignore the plain language of the contract."  Pennsylvania Power Co., 276 F.3d at 178 ("In United Paperworkers International Union, the Supreme Court made clear that an 'arbitrator may not ignore the plain

language of the contract.'") (quoting United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)).  It also would expand the scope of the proceeding beyond the issues presented by the parties.  See Matteson v. Ryder System Inc., 99 F.3d 108, 112-13 (3d Cir. 1996) (An arbitrator's authority is limited to determinations within the scope of the issues presented by the parties.).  Because the dispute plaintiff seeks to raise is predicated on rights that are independent of the CBAs and plaintiff's claim challenges a practice of purposeful exclusion of compensation in areas that potentially are protected by independently bestowed statutory rights, the arbitrator would be forced to conclude that 1) the employee does not seek to establish that the time is compensable under the CBAs and 2) resolving an application of the PMWA to the challenged time is beyond the scope of parties' contractual agreements.   In other words, as in Bell submitting the current claim to arbitration under the CBAs cannot have an impact on the resolution of plaintiff's statutory claim.[4]

Plaintiff's PMWA claim seeks to advance a claim founded on independent statutory rights bestowed on plaintiff as an individual hourly wage earner in Pennsylvania.  The claim advanced is not dependent on the terms of the CBAs and submission of the claim to the arbitration provisions in those agreements cannot have any impact on it.  Consequently, the claim is not subject to Section 301 preemption under the LMRA.

---

[4] The instant claim also is similar to the situation in Bell in that if the arbitrator were to conclude that the "uncompensated" time plaintiff has placed at issue was intended to be "covered" as a form of excluded activity under the provisions of the CBAs, as is alleged in the complaint, plaintiff's allegations that he and other workers were not paid for this time would remain.  In that event plaintiff would still have a claim that this activity, although negotiated to be a form of uncompensated time in the process leading to the CBAs, is compensable under the PMWA and the failure to receive payment for it is a violation of the PMWA notwithstanding its exclusion from compensation under the CBAs.  If the uncompensated time were to be deemed by the arbitrator to be outside of and thus "non-covered" time under the CBAs, the result would be the same and plaintiff likewise would be entitled to pursue his claim for statutory relief under Pennsylvania law.

Defendant's protestations to the contrary are wide of the mark. Defendant mounts a Herculean effort to interject the need to interpret the CBAs into the formation and resolution of plaintiff's claim. It highlights various provisions in the CBAs outlining 1) the location were compensable time begins and ends, 2) the definition of a standard workday and workweek, 3) uniform starting times and the number and length of days to be worked, 4) rates of pay and overtime pay, 5) shift differentials, and 6) a series of provisions addressing employer-furnished transportation prior to starting time and after quitting time, transportation after exiting the Project and so forth. It notes that the terms in these provisions address the same activities and subjects forming the foundation of plaintiff's claim. And it contends that each of these areas creates and interjects into plaintiff's claim the need to interpret the provisions of the CBAs in order to resolve it.[5]

---

[5] Defendant specifically highlights the following provisions in the CBAs:

Articles 8 and 18 of the NCA and Paragraph 3 of the Addendum regarding what constitutes hours worked. See, for example:

- NCA Art. 18, Sec. 18-1 ("Employment begins and ends at each project site");

- NCA Art. 18, Sec. 18-2 ("Employees shall be at their place of work at the starting time and shall remain at their place of work performing their assigned functions under the supervision of the Employer until quitting time");

- NCA Art. 8-1 ("The standard work day shall consist of (8) hours of work…" and "the standard work week shall be five (5) consecutive days of work");

- Addendum ¶ 3(a) ("A uniform starting time will be established for all crafts on each project or segment of work" and further delineating shift starting times and setting the number of days the workers will work and the length of their shift).

Articles 8 and 10 and of the NCA and Paragraph 3 of the Addendum with respect to the payment of wages and whether wage differentials or additional compensation are/is necessary

under various circumstances, such as working past one's ordinary shift or working on a different shift. See, for example:

- NCA Art 10-1 ("The Employer agrees to pay base hourly wage rates for those classifications outlined in Appendix A");

- NCA Art. 8-4 ("The first two (2) hours performed in excess of the standard work day Monday through Friday, shall be paid at the rate of time and one-half");

- NCA Art. 8-6 (providing for different quantities of compensable time depending on whether the employee works the first, second, or third shift);

- Addendum ¶ 3(b) (providing for the payment of shift premiums);

- Addendum ¶ 3(e) (providing for the payment of overtime);

- Addendum ¶ 7(c) (providing for the payment of additional compensation when employees work more than five hours and do not have a lunch period).

Paragraph 3 of the Addendum and the Memorandum regarding whether travel to and from the work site is a compensable activity. See, for example:

- Addendum ¶ 3(d) ("The employer will furnish transportation … prior to the shift starting time and the Employer will furnish transportation … at the shift quitting time.  All transportation by the Employer will be on employee's time. There will be no compensation …  The Employer will provide timely transportation, when employees exit the project gates at the end of the shift, back to the remote parking or park and ride area. There will be no compensation") (emphasis added);

- Memorandum (all of the signatory trades and crafts informed their members that travel will not be compensable).

Paragraph 3 of the Addendum that provides for compensation for non-work time.

- Addendum ¶ 3 ("Employees are in on Employee time and out on Employer Time.") (emphasis added).

Defendant's Brief in Support of Motion to Dismiss (Doc. No. 10) at p.10-11.  And in opposition to plaintiff's motion to remand defendant argues the following areas of interpretation will be needed:

The difficulty with defendant's position is that the PMWA is not dependent upon the content of the CBA to identify what is compensable work.  It is a statute passed by the Commonwealth of Pennsylvania, a sovereign state, and it was intended to provide individual

| Section of CBAs | Text of Section | Interpretation Needed |
|---|---|---|
| NCA Art. 18, Sec. 18-1 | "Employment begins and ends at each project site." | What is the "project site," i.e., where does the project site begin and end, and what are the employer's premises? |
| NCA Art. 18, Sec. 18-4; *see also* Addendum ¶ 3(c) | "Employees shall be at their place of work at the starting time and shall remain at their place of work performing their assigned functions under the supervision of the Employer until quitting time." | To determine the definitions of "place of work," "starting time," "assigned functions," and "quitting time." For example, what is the employee's place of work – the parking lot, the project site, and/or the employee's assigned work area? |
| Addendum ¶ 3(c) | "There shall be no pay for time not worked unless the employee is otherwise engaged at the direction of the Employer." | What is meant by "otherwise engaged?" Are employees engaged in work activities during the time they are traveling? Are they working during travel time? |
| Addendum ¶ 3(c) | "Employees are in on Employee time and out on Employer time." | To determine the meaning of "Employee time," "in" and "out," and "Employer time," particularly in light of the above-listed provisions. Does this phrase refer to travel time, time in and out, to and from the project site, or something altogether different from travel time? |
| Addendum ¶ 3(d) | "All transportation by the Employer will be on employee's time." | To determine what the phrase "employee's time" means. |

Defendant's Response in Opposition (Doc. No. 23) at 3-4.  From defendant's perspective, "interpretation of the CBAs is necessary to interpret the statutory language of the PMWA because the contract terms listed above, as well as other sections of the CBAs, define the compensable time for Plaintiff as agreed to by his employer."  Id. at 4.

workers with rights separate and apart from those in an employment contract. <u>Lugo</u>, 967 A.2d at

967 (highlighting the independent nature of the regulations governing an employee's "hours

worked" and entitlement to overtime under the PMWA) (citing 34 Pa. Code § 231.1 (hours

worked) and §§ 231.41 through 231.43 (entitlement to overtime)).  It provides individuals with

their own separate right of enforcement.  To suggest as defendant does that this statutory scheme

lacks independent meaning as to its core concepts and must and can only draw from and depend

on the governing employment agreement to define the concepts that will make its fundamental

terms enforceable is a proposition that does not find support in the statute or its regulations.  Nor

does it find support in the jurisprudential decisions applying the same.  Given this, we decline to

embrace this proposition.

Defendant's list of terms for interpretation also comes up short on several other levels.

As an initial matter, it would be disingenuous to ignore the fact that plaintiff does not seek to

recover based on a right or form of entitlement under the CBAs.  He admits that the CBAs do not

provide compensation for the travel, donning and post-shift walking and doffing time in

question.  And a review of the terms that defendant highlights merely serves to verify that

plaintiff's position in this regard appears to be accurate.  All travel is "on" the employee's time

and is not compensable work under the CBAs.  And any pre-start donning and post-quitting

walking and doffing time would appear to be off the clock, as alleged.  But the fact that the

unions and company negotiated away travel time and post-shift walking and equipment

maintenance time in the CBAs does not impact plaintiff's separate individual rights under the

PMWA.  Defendant essentially concedes as much.  <u>See</u> Defendant's Response in Opposition

(Doc. No. 23) at 14 ("Defendant does not take issue with Plaintiff's statement that employees

cannot waive their PMWA rights by private agreement.").  It nevertheless seeks to extinguish the

claim through Section 301 preemption on the premise that the duties of the employee can only be ascertained by consulting the CBAs, and this mere reflective review is enough.  Of course, such a result would render the state statutory scheme illusory by filtering all worker activity through the lens of identifying an employee's required duties under the collectively bargained employment contract.  We do not believe that the current body of law informing Section 301 preemption authorizes such a result.

Second, the fact that the CBAs contain provisions that address the same subject matter as the grounds for plaintiff's PMWA claim does not in itself bar the claim.  It has long been recognized that a state law claim is not preempted merely because a potential claim for breach of the applicable CBA could be made out from the same factual setting.  See Lingle, 486 U.S. at 409-10 ("In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes."); accord Oddo, 2017 WL 2172440 at *9 ("A NJWHL claim may overlap factually with a hypothetical LMRA claim.  But it is nevertheless independent; "[e]ven if resolution of a state-law claim 'involves attention to the same factual considerations as the contractual determination ... such parallelism [does not mandate preemption].'") (quoting Polanco v. Brookdale Hosp. Med. Ctr., 819 F. Supp. 2d 129, 133 (E.D. N.Y. 2011) (quoting Lingle, 486 U.S. at 408)).  And having to refer to a CBA is not dispositive.  See Volias, 170 F.3d at 377 ("the fact that the parties' agreements may be referred to in the course of deciding this issue is of little moment to the preemption question before us.  As the Court emphasized in Livadas, 'the bare fact that a

collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.'") (quoting Livadas, 512 U.S. at 124)).

Instead, it is the nature of the state law claim advanced and what must be proven to establish it that provides the proper focus in determining whether the claim is substantially dependent upon a CBA. And the mere fact that a CBA must be consulted in the course of establishing the state law claim does not convert it into one that requires an interpretation of a CBA. As our Court of Appeals has succinctly stated:

> Although [appellees] rely upon the "Management's Rights" and "Shop Rules" clauses of the CBA, they do not point to any specific provision of these clauses that must be interpreted in order to resolve Appellants' claims. Nor can we identify any provision that would require interpretation. A finding of § 301 preemption is not mandated simply by the contention that Appellants' state law claims "necessarily implicate" the CBA. That is, the mere fact that we must look at the CBA in order to determine that it is silent on any issue relevant to Appellants' state claims does not mean that we have "interpreted" the CBA. As the Ninth Circuit Court of Appeals has recently stated in applying Livadas:
>
> > [A]lleging a hypothetical connection between the [state law] claim and the terms of the CBA is not enough to preempt the claim: adjudication of the claim must require interpretation of a provision of the CBA. A creative linkage between the subject matter of the claim and the wording of a CBA provision is insufficient; rather, the proffered interpretation argument must reach a reasonable level of credibility. Cf. Livadas, 512 U.S. at 124–25, 114 S.Ct. 2068, 129 L.Ed.2d 93. The argument does not become credible simply because the court may have to consult the CBA to evaluate it; "look[ing] to" the CBA merely to discern that none of its terms is reasonably in dispute does not require preemption. Id. at 125, 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93.

Kline, 386 F.3d at 256-57 (quoting Cramer v. Consolidated Freightways Inc., 255 F.3d 683, 691 (9th Cir. 2001) (en banc)). Indeed, referencing a CBA to explain or establish a course of conduct does not convert a claim based of independent statutory rights into one that is about or arises from the rights or obligations in a CBA. See Bull v. United Parcel Service, Inc., 2014 WL 2965696, *14 (D. N.J. July 1, 2014) ("The CBA may have been relevant to the determination of certain issues of fact, but there is no dispute about what it says, what it means, whether it is valid,

or whether Ms. Bull is bound by it.  Like the defendant in <u>LaResca [v. AT&T</u>, 161 F. Supp.2d

323 (D. N.J. 2001)], UPS cites the CBA to bolster its case and justify its actions.  That is

perfectly permissible, but it does not transform this case into one about, or arising from, the

CBA.), <u>affirmed in part, dismissed in part</u>, 620 F. App'x 103 (3d Cir. 2015).

      As explained above and as is evident from the terms of the CBAs highlighted by

defendant, the CBAs merely provide evidence of certain factual contentions that plaintiff

advances to support his claim: to wit, the travel time to the employee's assigned job site and the

return of the employee to the parking lot, while being prior and post activities undertaken to

perform the employee's compensable duties under the CBAs, are not activities for which the

employee receives wages under the CBAs.  <u>See</u>, <u>e.g.</u>, Addendum at ¶ 3(c) ("Employees are in on

Employee time and out on Employer time" and ¶ 3(d) ("All transportation by the Employer will

be on employee's time.").  Pre-starting time spent donning and post-quitting time spent doffing

do not appear to be within the scope of compensable work as defined by the CBAs.  <u>Id.</u> at ¶ 3(c).

Proving these factual activities are uncompensated activities as part of the PMWA claim and

making the legal determination as to whether such activities fall within the definition of "hours

worked" under Pennsylvania's statutory scheme simply falls short of a "live" dispute that requires

actual interpretation of the CBAs.

      Finally, the cases defendant advances are distinguishable or are otherwise unpersuasive.

<u>Townsend</u> is distinguishable.  There, the issue was whether the time employees spent donning

and doffing personal protective equipment was compensable time under the FLSA and the

PMWA.  The court resolved the FLSA claim on the ground that the CBA provided for 12

minutes per week for "wash up time" and thus interpretation was required in order to determine

whether the union and employer had bartered the time in question as part of the agreement on

wash up time, thereby making the FLSA claim contingent on the application of the CBA and analogous with the situation in <u>Vadino</u>.  Such bartering is permitted under § 203(o) of the FLSA which permits bargaining entities to exclude from working hours the "time spent in changing clothes or washing" through the terms of a collective bargaining agreement.  And the court resolved the PMWA claim based on the same rationale: that "determining whether Plaintiffs' claim that time spent 'donning and doffing" represents hours worked is a matter of interpretation of the CBA, requiring the court to find preemption in accord with <u>Vadino</u>."  <u>Townsend</u>, 2007 WL 442386 at *5.

Judge Baylson did not have the benefit of <u>Bell</u> and its progeny, which elucidated the factual nature of parallel events giving rise to separate statutory claims that do not depend on the terms of a CBA to establish liability.  He likewise did not have the benefit of the subsequent precedent emphasizing that in enacting the PMWA the Pennsylvania General Assembly declined to incorporate a comparable provision to § 203(o) of the FLSA.  In doing so, the legislature precluded the parties from compromising such individual rights in the bargaining process.  Nor did he have the benefit of 1) the opinions of the Pennsylvania courts emphasizing the separate, independent nature of the PMWA, <u>see</u>, <u>e.g.</u>, <u>Bayada Nurses, Inc.</u> and <u>Chevalier</u>, *supra*, and 2) the Superior Court's determination in <u>Lugo</u> that the regulations promulgated pursuant to the PMWA provide a separate, legal definition of "hours worked" and donning and doffing may factually fall within the scope of that definition notwithstanding any separate or distinct treatment of such

activities under the FLSA.  <u>Lugo</u>, 967 A.2d at 966-67.[6]  These developments and the factual

allegations presented here persuade us to chart a different course.[7]

     Defendant's reliance on <u>Amtrak</u> is misplaced for similar reasons.  First, <u>Amtrak</u> was not

decided under Section 301 of the LRMA and therefore is not directly on point.  Second, the

panel in <u>Amtrak</u> did not have the benefit of the complete linage of the Supreme Court's

clarification of Section 301 preemption.  Nor did it have the benefit of the numerous Third

Circuit opinions such as <u>Bell</u> that carefully considered the full import of that linage as it relates

to the scope of Section 301 preemption and its impact on parallel claims that are predicated on

individual, statutory rights granted under other sources of law.  And the state law highlighted

---

[6] For example, the definition of "hours worked" includes the time an employee is required by the employer "to be at the prescribed work place" and the "time spent in traveling as part of the duties of the employee during normal working hours" and the "time during which an employee is employed or permitted to work."  <u>Id.</u> (quoting 34 Pa. Code § 231.1).  Such matters raise factual questions.  <u>Id.</u> ("According to the complaint then, appellee required appellants to be on its premises and on duty during the donning, doffing, and sanitizing of the protective gear.  If the averments of the complaint are proven true, then clearly the PMWA would consider the time spent donning, doffing, and sanitizing the protective gear as part of the "hours worked" and for which appellants would be owed wages under the PMWA."); <u>cf.</u> <u>Barrentine</u>, 450 U.S. at 743 ("FLSA claims typically involve complex mixed questions of fact and law - <i>e. g.</i>, what constitutes the 'regular rate,' the 'workweek,' or 'principal' rather than 'preliminary or postliminary' activities.  These statutory questions must be resolved in light of volumes of legislative history and over four decades of legal interpretation and administrative rulings.").  Resolution of these factual inquiries easily can involve the consultation of a CBA in a manner that falls short of requiring an "interpretation" of it within the meaning of the LRMA.

[7] Judge Buckwalter's decision in <u>Drake v. Hyundai Rotem, USA, Corp.</u>, 2013 WL 4551228 (E.D. Pa. Aug. 28, 2013), is unpersuasive for the same reasons.  It was issued prior to <u>Bell</u> and did not have the insight from <u>Jones</u>.  It did not discuss the Pennsylvania legislature's decision to forgo incorporating a provision similar to § 203(o) of the FLSA into the PMWA, the impact of that decision with regard to the protections afforded by the PMWA, or the subsequent development of Pennsylvania law as it relates to the independent nature of the claims brought thereunder.  In addition, it appears to conclude that the fact that the CBA contained provisions that addressed the same subjects, and thereby would be consulted or reviewed in the adjudication, is in itself a form of interpreting a CBA.  We find it unpersuasive for these reasons.

above did not exist.  These developments and the factual allegations presented persuade us that Amtrak does not extinguish plaintiff's PMWA claim.

Finally, the panel's non-precedential opinion in Smith v. Allegheny Technologies, Inc., 754 F. App'x 136 (3d Cir. 2018), likewise does not mandate that plaintiff's PMWA claim be extinguished under Section 301 preemption.  There, temporary workers hired to work in a steel plant during a lockout of union workers sought to recover under both the FLSA and the PMWA for travel time spent crossing a picket line in company vans in order to enter and leave the steel plant.  Chief Judge Hornak dismissed the claims.  The FLSA claim was dismissed because the temporary workers had failed to allege facts that showed the travel time was "principle activity" or otherwise "integral and indispensable" to such an activity under the FLSA as amended by the Portal-to-Portal Act, 29 U.S.C. § 254(a).  The PMWA was dismissed for the same reasons.  Id. at 138-41.

The Smith court reversed the district court's dismissal of the PMWA and remand for the district court to consider whether transfer of that claim to state court was appropriate.  Id. at 140-42.  An important part of the decision was based on the fact that "Pennsylvania has not enacted the Portal-to-Portal Act, and Pennsylvania law requires compensation for a broader range of activities, including travel time, than the FLSA."  Id. at 141.  The district court had held that for travel time to be compensable under the PMWA, an employee must also "perform work-related tasks, aside from the travel, during [that time]."  The panel rejected this proposition and followed Amtrak's holding that "the Pennsylvania travel regulation requires courts to inquire into the underlying employment agreement" and in that case the CBA had "provided the 'the only way' to determine if the employees [were] required to travel on the AMTRAK vehicle after their work shifts [were] done."  Id. (quoting Amtrak, 989 F.2d at 115).

In ascertaining the proper focus for applying Pennsylvania's PMWA regulation as it relates to travel time, the <u>Smith</u> court drew on the general understanding of the text in the Pennsylvania regulations and opined:

> That courts must determine whether the uncompensated activity is required under the contract is consistent with a plain text reading of "duties of the employee" under the regulation.  Black's Law Dictionary defines a "duty" as "[a] legal obligation that is owed or due to another and that needs to be satisfied."  Black's Law Dictionary 580 (9th ed. 2009).  An obligation "may refer to anything that a person is bound to do or forbear from doing." <u>Id.</u> at 1179 (emphasis added).

<u>Smith</u>, 754 F. App'x at 141.  The plaintiffs' employment contracts were not in the record.  Notwithstanding this, they had alleged that 1) as part of their employment they were required to cross the picket line in vehicles provided by the defendants and 2) they were required to follow the defendants' instructions regarding that activity "as a term and condition of their employment." <u>Id.</u>  These independent factual allegations were sufficient to plead "that riding in [] the vans was a duty of the employees and thus compensable under the PMWA." <u>Id.</u>

To be sure, the <u>Smith</u> court was not confronted with the question of Section 301 preemption.  And as defendant here emphasizes, it did acknowledge that ascertaining the duties of an employee under the Pennsylvania regulations does require the court to inquire into the employment agreement in question.  But that inquiry is guided by the independent obligations Pennsylvania law imposes on employers operating within its borders and encompasses "anything that a person is bound to do" as part of the employment agreement.  Thus, the fact that the formal agreement did not obligate the defendants to pay the temporary workers for traveling across the picket lines in company provided vans was not a bar to the PMWA claim.  And the plaintiffs' allegations that they were required to do so and follow the defendants' specific instructions about how to do so as a condition of employment provided independent allegations of fact outside the formal employment contracts which stated a claim.

Smith is instructive to the instant matter on two levels.  First, the inquiry under Pennsylvania's travel regulations is one guided by the separate, legal nature of the PMWA's regulations.  Second, in conducting the independent determination of whether the employee is under a duty and thus "required" to perform the activity in question, the inquiry is not limited to the formal agreement between the parties outlining compensable work and wages, but draws on the entirety of the factual underpinnings forming the employment relationship.  These insights from a studied reading of Smith support the conclusion we reach here.

A claim founded on the right to receive overtime compensation for uncompensated activities falling within the scope of the PMWA is one that is separate and independent from the terms of the parties' bargained agreement as to compensation.  Smith, 754 F. App'x at 141; In re Cargill, 632 F. Supp.2d at 393; Soles v. Zartman Constr., Inc., 2014 U.S. Dist. LEXIS 98181, *6 (M.D. Pa. July 18, 20140 ("The PMWA does not require a contract, and in fact the existence of a contract that fails to conform to the PMWA, such as one containing an agreement to a wage below the applicable minimum wage, does not excuse noncompliance.") (citing 43 P.S. § 333.113); cf., Bell, 733 F.3d at 493 (the protections afforded by wage and hour laws take precedent over collectively bargained contractual terms save statutory authorization to the contrary); Jones, 857 F.3d at 514 (same); New Jersey Carpenters, 760 F.3d at 306 ("§ 301 cannot be read broadly to preempt nonnegotiable rights conferred on individual employees as a matter of state law. . . .  The right to prevailing wages [under New Jersey's Prevailing Wage Act] is just such an inalienable right.") (citing Livadas, 512 U.S. at 123).  Examining the entire employment agreement in order to determine whether "uncompensated activity is required" as part of the employment arrangement and thus reflects a "duty" of the employee under Pennsylvania's regulations is a correlative to the independent nature of the PMWA.  In the absence of an explicit

or implicit reliance on contractual rights in establishing a PMWA claim, confining the inquiry about uncompensated activity to the employment contract's explicit terms defining compensable work would permit the very mischief the General Assembly sought to address through passage of the PMWA.  See Chevalier, 220 A.3d at 1055, 1059 ("the General Assembly did not mince words in stating its purpose" in enacting the current version of the PMWA and it created a "strong public policy favoring employee protection" in order to assure wages are not improperly diluted through contractual arrangements).  Furthermore, limiting the inquiry pertaining to the duties required of the employee under the PMWA as they relate to uncompensated activity to an examination of the CBA's allocation of compensable work through Section 301 preemption would be tantamount to permitting the bargaining entities to a CBA to contract their way around undesirable state wage and hour laws, a proposition which the Supreme Court of the United States long ago straightforwardly rejected.  See Allis-Chalmers Corp., 471 U.S. at 211-12.  In doing so the Court opined:

> Section 301 on its face says nothing about the substance of what private parties may agree to in a labor contract.  Nor is there any suggestion that Congress, in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation.  Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored.  Clearly, § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law.  In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

Id.  Recognizing Section 301 preemption here potentially could open the door to this very result.

Plaintiff has not alleged a violation of any term or condition of the CBAs.  It does not appear from the allegations that any aspect of his claim is founded on rights created by the CBAs.  Nor is his PMWA claim dependent upon the application of an ambiguous term in the CBAs that could be interpreted in a way that would eliminate or reduce the relief available on

that claim.  Although the PMWA claim relates to activities that occurred in  conjunction with the

performance of compensable duties under the CBAs, the claim is nonetheless grounded in

individual, statutory rights granted under state law.  Resolution of the factual issues giving rise to

liability under the PMWA will not frustrate the uniform development of federal law governing

labor contract interpretation nor permit an employee to sidestep the grievance machinery by

disguising a breach of contract claim as a statutory wage and hour claim.  Consequently, the use

of Section 301 preemption to extinguish plaintiff's PMWA claim would be inappropriate.

Having determined that plaintiff's claim is not preempted by Section 301 of the LRMA,

the issues raised by plaintiff's motion to remand properly are considered.  It is well settled that

the exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 is discretionary once it

has been determined that a federal question is not or is no longer in the case.  See 28 U.S.C. §

1367(c)(3).  Where Section 301 preemption does not apply to the state law claim that has been

removed, the court retains discretion to remand the case to state court.  See Trans Penn Wax

Corp., 50 F.3d at 233 ("It is settled that district courts have discretion to remand to state court 'a

removed case involving pendent claims upon a proper determination that retaining jurisdiction

over the case would be inappropriate.'") (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343,

357 (1988)).  Exercising that discretion centers around "what best serves the principles of

economy, convenience, fairness, and comity.").  Id.

Here, the court has determined that plaintiff's claim is not preempted by federal law.  The

case has not progressed beyond the pleading stage.  The convenience of the parties and the

fairness of the adjudication would not be meaningfully impacted by adjudication of the claim in

the Beaver County Court of Common Pleas.  The claim raises important issues of state law, the

resolution of which are best left to the Commonwealth courts.  For all these reasons, plaintiff's motion to remand has been granted.

For the reasons set forth above, defendant's motion to dismiss has been denied and Plaintiff's motion to remand has been granted.  Appropriate orders will follow.

Date: September 25, 2020

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:     G. Timothy Conboy, Esquire
        Peter Winebrake, Esquire
        Clare M. Gallagher, Esquire
        Derek J. Illar, Esquire
        Lindsey C. Kennedy, Esquire
        Taylor N. Brailey, Esquire

        (*Via CM/ECF Electronic Mail*)

43